Victor E. La Rue, Eugene A. Tappy and Ruth L. Leffler, all of Chicago, Ill., for appellant.

J. X. Schwartz, Raymond J. Friend and Carl Meyer, all of Chicago, Ill. (Mayer, Meyer, Austrian & Platt, of Chicago, Ill., of counsel), for appellees.

Before MAJOR, Chief Judge, SPARKS, Circuit Judge, and LINDLEY, District Judge.

MAJOR, Chief Judge.

This appeal is by the plaintiff from an adverse judgment, entered April 21, 1948, upon Count II of a complaint wherein recovery was sought on an alleged agreement between the parties.[1]

The complaint (when used in this opinion refers to Count II) alleged that from September 28, 1936 until January 24, 1945, a license agreement existed between the parties by which plaintiff authorized the defendants to manufacture and sell the inventions of patents owned by the plaintiff for Snap-Tys and Tyscrus, devices used in connection with concrete construction. It

## RICHMOND SCREW ANCHOR CO., Inc. v. UMBACH et al.

### No. 9642.

United States Court of Appeals
Seventh Circuit.

Jan. 18, 1949.

Rehearing Denied March 15, 1949.

---

[1] Count I charged infringement by the defendants of certain patents owned by the plaintiff. A separate judgment was entered on each count. In 7 Cir., 173 F. 2d 521, defendants appeal from the adverse judgment on Count I, and in No. 9642 (the instant appeal) plaintiff appeals. The two appeals have by agreement been consolidated in this court. We are simultaneously filing a separate opinion as to each.

further alleged that defendants had paid only a part of the agreed percentage of royalties for the period of the license agreement, and recovery was sought for the remainder.

The defendants in 1936 organized a business which, at the time of the filing of the complaint, they operated as co-partners, doing business under the name of Superior Concrete Accessories. In the beginning they did business as the Standard Accessories Company, a corporation, which name was changed to Superior Concrete Accessories, Inc. This latter corporation was dissolved in the year 1941. Plaintiff is a New York corporation, and by the license agreement authorized the defendants to manufacture and sell in and adjacent to Chicago certain of its products, including Snap-Tys and Tyscrus. A preliminary written agreement was entered into between the parties December 8, 1936, labeled "Proposed Plan with Western Associates." This agreement contained no provision for the percentage of royalties to be paid by the defendants.

Subsequently, a series of letters was exchanged between the parties which resulted in an agreement, so plaintiff contends, by which the defendants were to pay a royalty of 5% on Snap-Tys and 10% on Tyscrus. Defendants contend that the only agreement made called for a payment of 2½% on Snap-Tys and 7½% on Tyscrus. Defendants paid royalties on these percentages and, admittedly, there is nothing due and owing the plaintiff calculated thereon.

The sole issue, therefore, in the court below, as here, was whether the defendants were obligated by their agreement to pay the additional 2½% on Snap-Tys (a total of 5%) and an additional 2½% on Tyscrus (a total of 10%). The court made findings of fact as to the correspondence exchanged by the parties concerning the percentage of royalties to be paid, and concluded:

"The court holds as a conclusion of law that the parties at no time reached any agreement by which the royalty percentages on the sales of Snap-Tys and Tyscrus were increased above 2½% on sales of Snap-Tys and above 7½% on sales of Tyscrus."

And, further, the court found that the parties contemplated that a change in the percentage of royalties might be made by a subsequent agreement that "no such agreement for any increase or decrease was ever reached and the conduct of the parties indicates that the percentages of 2½% on sales of Snap-Tys and 7½% on sales of Tyscrus agreed upon in September 1937 were never changed."

Inasmuch as the conclusion of the lower court that there was no agreement by which the defendants obligated themselves to pay the increased royalties must be determined from the correspondence, it appears necessary to relate it. As already noted, the agreement of December 8, 1936 made no mention of the percentage of royalties to be paid. In a letter to the defendants dated September 13, 1937, plaintiff stated:

"First, we have the 'Proposed Plan with Western Associates' dated December 8, 1936, a copy of which is attached. The only thing lacking in that is the percentage we are to receive for rental. This we talked over many times as being 10% on Tyscrus and 5% on Snap-Tys."

It will be noted that this letter does not claim that an agreement was had as to the percentages to be paid but that they had been "talked over many times." The defendant Umbach, called as an adverse witness by the plaintiff, denied that he had said or agreed that the percentages would be as suggested in this letter.

On September 24, 1937, defendants, in reply to this letter, wrote the plaintiff:

"About the royalties or the percentage, or whatever you want to call it, on Tyscrus and Snaptys, we feel that we would like to pay you 2½% on all sales of Snaptys, and 7½% on Tyscrus, Tyhangers, Tyframes, etc., for the time being at least. We both know what the cost of manufacture is on Snaptys, and until we can either lower our costs or get a better price than we are getting, we can only make our overhead out of this item, and this is about all. On the Tyscrus, 10% would be the logical percentage to pay, but we are ask-

ing you if you will be content with 7½% for another six or nine months, until we are in a better position to analyze our costs, and the profit that Tyscrus are giving to our business. We want to give Richmond as much as we can, but on the other hand, we must show a reasonable gross profit in order to keep ourselves in existence. * * *

"My idea is that this percentage should be kept slightly flexible, with a minimum as the 7½% on Tyscrus and 2½% on Snaptys, a maximum of 10% and 5% on those items. We trust this will meet with your approval."

On September 28, 1937, plaintiff wrote the defendants:

"Since we are desirous of helping you in every way possible we will agree to the 2½% on all sales of Snaptys and 7½% on Tyscrus, Tyhangers, Tyframes, etc. until such time as you are in a position to better this return to us. It is our intention to make these returns as flexible as possible to continue our aid. Even if those percentages were written into the agreement which we ask you to send to us, it could be so written that the percentage could be increased or decreased as business conditions warrant. In this connection, Mr. Umbach, you can figure on us for full support."

On September 30, 1937, defendants wrote the plaintiff, which in the main was merely an expression of their appreciation for plaintiff's attitude, with some commendatory remarks concerning the utility of SnapTys and Tyscrus. We find nothing in the letter material to the question before us and omit it.

On October 4, 1937, plaintiff sent defendants with its letter of that date the "Proposed Plan with Western Associates," dated December 8, 1936, which was approved by the defendants October 6, 1937. Royalty percentages were fixed by an addition thereto, which reads as follows:

"Added Sept. 28, 1937.
"Per Superior Concrete Accessories, Inc. letter of September 24, 1937:
"'My idea is that this percentage should be kept slightly flexible, with a minimum as the 7½% on Tyscrus' (etc.) 'and 2½% on Snaptys, a maximum of 10% and 5% on those items.' and our reply of September 28, 1937, in which we agree to these percentages increasing and decreasing as business conditions warrant."

Any detailed discussion of this correspondence which plaintiff relies upon as constituting an agreement for payment by the defendants of the increased royalties would serve no useful purpose. The letters speak for themselves. We agree with the lower court that no agreement was reached by which the defendants were obligated to pay an increased royalty. True, it appears that the parties contemplated that at some future time a change would be made in royalties either by way of increase or decrease. "My idea is that this percentage should be kept slightly flexible" (defendants' letter to plaintiff September 24, 1937), and "It is our intention to make these returns as flexible as possible" (plaintiff's letter to defendants September 28, 1937). The most that can be said relative to an agreement is that the parties understood that at some time in the future a change would be made, which was left for future negotiation and agreement. However, there was thereafter no negotiation or agreement for increased percentages. Where an essential element of a contract is reserved for future agreement, no legal obligation as to such element arises until such future agreement is made. Boatright v. Steinite Radio Corp. et al., 10 Cir., 46 F.2d 385, 389; Weegham v. Killefer, D. C., 215 F. 168, 170; Wynne et al. v. McCarthy et al., 10 Cir., 97 F.2d 964, 970; Sterenberg v. Beach, 219 Ill.App. 68, 73.

Plaintiff cites a number of cases in support of its argument that the agreement containing no specified date when the 5 and 10% was to be paid, a reasonable time is annexed to the promise by the law, and that the defendants became liable after a reasonable time to pay. Typical of such authorities is Allen v. Estate of Henry P. Allen, 217 Ill.App. 260, and Folkerts v. Shields, 319 Ill.App. 261, 262, 49 N.E.2d 295. In this class of case, however, it is found that there was an acknowledgement of an indebtedness with only its date of maturity remaining uncertain. In such cases it was held that the law implies a promise to pay within a reasonable time.

Such cases are distinguishable from the instant situation and do the plaintiff no good because here there was no promise to pay the increased royalty but at most only an agreement that a change would be made at some time in the future, and such change depended upon a subsequent meeting of the minds.

Furthermore, we think that plaintiff's course of conduct is inconsistent with the interpretation which it now seeks to place upon the correspondence as a basis for the asserted agreement. Between the period in September 1937 and the date of the termination of the agreement in 1945, the defendants or their predecessor sent to plaintiff and plaintiff duly received some eighty-six credit memoranda showing the total amount of sales of Snap-Tys and Tyscrus during this period. Each memorandum disclosed the credit to Richmond, figured at 2½% on sales of Snap-Tys and 7½% on sales of Tyscrus. The evidence also shows that during this period defendants sold goods to the plaintiff and that on some occasions the balance was in favor of the defendants. In such situations the mutual accounts would be balanced by plaintiff paying to defendants the difference, figuring the amount owing by the defendants on the basis of 2½% on Snap-Tys and 7½% on Tyscrus.

There are numerous other circumstances of a similar nature which clearly disclose that plaintiff, without complaint or question, over a period of some eight years recognized defendants' obligation predicated on 2½% and 7½%. It was not until eight months after the contract was terminated when, at the request of plaintiff, an audit of defendants' books was made, for the purpose of determining whether defendants had properly accounted on a basis of 2½% and 7½%. It was only after an account had been stated on that basis and payment made by the defendants that plaintiff sent defendants an invoice based upon the increased percentages of 5 and 10%. Thus, it appears that the claim which the plaintiff now asserts was the result of an afterthought. The manner of plaintiff's recognition of its agreement with the defendants while they were engaged in its performance and before any controversy had arisen concerning it strongly militates against the interpretation now sought. Fitzgerald v. First National Bank, 8 Cir., 114 Fed. 474, 478; Long-Bell Lumber Co. v. Stump, 8 Cir., 86 F. 574, 578; Barritt v. Steidinger, 196 Ill.App. 229, 231.

The judgment appealed from is

Affirmed.